Harry HURSTON, Petitioner,

v.

DIRECTOR, OFFICE OF WORKERS COMPENSATION PROGRAMS; McGray Construction Company; Beaver Insurance Company, Respondents.

No. 91–70528.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 4, 1993.

Decided April 1, 1993.

John R. Hillsman, McGuinn, Hillsman & Palefsky, San Francisco, CA, for petitioner.

Marianne Demetral Smith, U.S. Dept. of Labor, Washington, DC, for respondent Director, Office of Workers' Compensation Program.

Roger A. Levy, Laughlin, Falbo, Levy & Moresi, San Francisco, CA, for respondents McGray Const. Co. and Beaver Ins. Co.

Before: ALARCON, RYMER, and T.G. NELSON, Circuit Judges.

RYMER, Circuit Judge:

Harry Hurston petitions for review of the Benefits Review Board decision and order denying him benefits under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901–950. We must decide whether a structure built on pilings that reaches from land to navigable water is a "pier" which is a covered situs under § 903(a) even though it is not used for a traditional maritime activity such as the loading or repair of vessels.

We hold that it is. The LHWCA's "status" requirement restricts coverage to only those employees engaged in maritime employment under § 902(3), but its "situs" requirement does not require that any pier adjoining navigable waters of the United States be used as a navigational aid or for boat hook-ups or the like to be covered under § 903(a). Therefore, it is the type of

structure rather than its function which defines "any adjoining pier" under the Act. We have jurisdiction under 33 U.S.C. § 921(c), and we reverse.

## I

Hurston worked as a pile driver on Elwood Pier No. 1 for McGray Construction Company in March, 1985. Elwood Pier No. 1 is a structure built on pilings extending from land to sea in the Santa Barbara channel. Oil is pumped from a nearby well and piped into Elwood Pier No. 1 where it is separated into water, gas, and crude oil. The crude oil is stored until it is pumped into a pipeline to be picked up by a tanker. Hurston was injured when a 1,000 pound sheet pile fell from a crane, landed on him, and left him permanently disabled. He filed a disability claim under the LHWCA against McGray and its workers' compensation insurer, Beaver Insurance Company.

The Administrative Law Judge found that Hurston qualified as a maritime employee under § 902(3),[1] and held that Elwood Pier No. 1 was a covered "adjoining pier" within § 903(a).[2] The ALJ also found that Hurston was injured while replacing a thousand pound sheet pile on Elwood Pier

No. 1, that Elwood Pier No. 1 was built on pilings and extended over water, and that it was a "pier" within the ordinary meaning of that term.

McGray appealed both findings to the Benefits Review Board. The Board held that a nexus with maritime activity is required for coverage under the Act, and since Elwood Pier No. 1 was used only for oil production, it lacked the requisite relationship to vessels and maritime activity.[3] Therefore, it reversed the order awarding benefits to Hurston.

Hurston seeks review of the Board's determination that § 903(a) extends geographic coverage only to those adjoining piers which have a maritime use.

## II

We review the Board's decision for "errors of law and adherence to the substantial evidence standard." *Port of Portland v. Director, Office of Workers' Compensation Programs*, 932 F.2d 836, 838 (9th Cir.1991). There is no dispute about the characteristics of the structure in this case. Since the Board is not a policy making body, we give no special deference to

---

1. Section 2(3) of the Act provides:
   The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include—
   (A) individuals employed exclusively to perform office clerical, secretarial, security, or data processing work;
   (B) individuals employed by a club, camp, recreational operation, restaurant, museum, or retail outlet;
   (C) individuals employed by a marina and who are not engaged in construction, replacement, or expansion of such marina (except for routine maintenance);
   (D) individuals who (i) are employed by suppliers, transporters, or vendors, (ii) are temporarily doing business on the premises of an employer described in paragraph (4), and (iii) are not engaged in work normally performed by employees of that employer under this chapter;
   (E) aquaculture workers;
   (F) individuals employed to build, repair, or dismantle any recreational vessel under sixty-five feet in length;

   (G) a master or member of a crew of any vessel; or
   (H) any person engaged by a master to load or unload or repair any small vessel under eighteen tons net;
   if individuals described in clauses (A) through (F) are subject to coverage under a State workers' compensation law.
   18 U.S.C. § 902(3).

2. Section 3(a) of the Act, which defines the situs requirement, provides:
   compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).
   33 U.S.C. § 903(a).

3. The Board did not reach the ALJ's finding of status, and the issue of whether Hurston was a maritime employee is not before us on appeal.

its interpretations of the Act. *Id.* However, we do "accord 'considerable weight' to the construction of the statute urged by the Director ... as he is charged with administering [the statute]." *Force v. Director, Office of Workers' Compensation Programs*, 938 F.2d 981, 983 (9th Cir.1991); *Port of Portland*, 932 F.2d at 838. For example, in *Force* we found that since "the statute is easily susceptible to the Director's interpretation, we need go no further." *Force*, 938 F.2d at 984.

### III

Hurston and the Director argue that under the plain statutory language, the Benefits Review Board erred in holding that a § 903(a) "adjoining pier" must have a relationship to navigation and commerce over navigable waters. The Director's interpretation is that, for the purposes of the statute, an "adjoining pier" is a structure built on pilings extending from land to navigable water, regardless of the structure's use. The Board did not take issue with the ALJ's finding that Hurston was injured on a structure that resembled a pier to the extent that it extended from the beach on pilings and touched the water at high tide. Rather, it held as a matter of law that a structure may not be considered a "pier" based only on its appearance and location. The Board reasoned that, "[a]lthough the requirement that an area be customarily used for loading, unloading, building or repairing a vessel does not apply to the structures explicitly listed in Section 3(a), we believe that a facility must have a maritime use in order to be considered a 'pier.'" McGray similarly urges the court to look beyond the mere appearance of the structure on which injury occurred and, as the Board did, to consider whether it has a functional connection to maritime or navigational activity.

. While we agree with McGray that we should not necessarily be bound to the principle "if it walks like a duck, if it sounds like a duck, it's a duck," if it appears to be a pier, if it is built like a pier and adjoins navigable waters, it's a pier. In short, as in *Force*, the statute is easily susceptible to the Director's interpretation.

### A

■ As with all statutory interpretations, we begin with the language of the statute. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The plain language of § 903(a) supports the Director's interpretation. It says that compensation is payable if disability results from an injury occurring "upon the navigable waters of the United States (*including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel*)." 33 U.S.C. § 903(a) (emphasis added). The phrase "any adjoining pier" is unqualified, whereas "other adjoining area" is qualified so as to require a relationship to maritime activity.[4] Thus, unless the injury occurs on a pier, wharf, dry dock, terminal, building way, or marine railway adjoining navigable waters, to be covered it must occur on "other adjoining areas" which are "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel." When, however, the injury occurs on a pier, so long as it is adjoining navigable waters, it is within the situs requirement.

If Congress had wanted to restrict "any adjoining pier" to cover only those piers used for maritime purposes, it could have easily said so. Or, it could have eliminated the phrase "other adjoining area," so that "pier, wharf, dry dock, terminal, building way, [and] marine railway" would also have been modified by "customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel[ ]." Likewise, the drafters could have

---

**4.** As the Supreme Court observed in *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 280–81, 97 S.Ct. 2348, 2365–66, 53 L.Ed.2d 320 (1977), "it is not at all clear that the phrase 'customarily used' was intended to modify more than the immediately preceding phrase 'other areas.'"

put a comma after "other adjoining area" had they wished "any adjoining pier" to be modified by "customarily used." *See* Larson, *The Conflicts Problem Between the Longshoreman's Act and State Workman's Compensation Act Under the 1972 Amendments*, 14 Houston L.Rev. 287, 294 (1977). As written, the language does none of these things.

■ Accordingly, under the plain meaning of § 903(a), a pier adjoining navigable waters of the United States, as Elwood Pier No. 1 admittedly is, is a covered situs without regard to its use for a maritime purpose.

**B**

In addition to the plain language, the history and context of § 903(a) support the Director's interpretation.[5] The LHWCA is basically a workmen's compensation system for maritime workers injured on or near navigable waterways. The Act became necessary because the Supreme Court had held in 1917 that the states were without power to extend workmen's compensation remedies to injuries at sea. *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917). As a result of *Jensen*, a longshoreman would be insured by state workmen's compensation if he were injured on land, but would be uninsured if he were injured on a boat or at sea. The difference between land and sea, and coverage or no coverage, came to be known as the *"Jensen* line." *See, e.g., Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 257, 97 S.Ct. 2348, 2353, 53 L.Ed.2d 320 (1977).

Congress wanted to provide comprehensive coverage for longshoremen, and tried unsuccessfully to encourage state programs through delegation. *Id.* Finally, in 1927, it enacted the LHWCA to create a federal system of workmen's compensation to cover harbor workers and longshoremen so as to have " 'one law to cover their whole employment, whether directly part of the process of loading or unloading a ship or not.' " *Id.* (quoting H.R.Rep. No.

639, 67th Cong., 2d Sess. 2 (1922)). Whereas before longshoremen and harborworkers were either covered under state programs or not covered at all, after the LHWCA was passed they were either covered under state programs or the federal LHWCA.

For the next forty-five years, the line dividing coverage under the LHWCA and state programs depended almost exclusively upon the situs of the injury. Though the situs line was somewhat unsettled early on, in 1969 the Supreme Court held that coverage under the LHWCA stopped at the *"Jensen* line." *Nacirema Operating Co. v. Johnson*, 396 U.S. 212, 223-24, 90 S.Ct. 347, 354, 24 L.Ed.2d 371 (1969) (LHWCA does not apply to longshoreman injured while on pier unloading cargo). Thus, if an employee were injured on navigable waterways, he would be covered under the LHWCA, but if he were injured on land, he would be covered under state workmen's compensation. The status test was easy to meet: anybody who worked for a maritime employer was covered regardless of the type of work the employee did. For example, in *Pennsylvania R. Co. v. O'Rourke*, 344 U.S. 334, 73 S.Ct. 302, 97 L.Ed. 367 (1953) a railroad brakeman was injured while removing railbox cars from a float. The Court held that the brakeman passed the status threshold since the statute "is directed at the employer when it speaks of maritime employment, not [to] the work [of] the employee." *Id.* at 340, 73 S.Ct. at 305.

This rule emphasizing situs over status rested coverage on the often fortuitous location of an injury. For example, in *Nacirema*, 396 U.S. 212, 90 S.Ct. 347, longshoremen were injured when a crane which lifted cargo from a pier onto a ship swung back and knocked the workers into the pier. The Supreme Court held that since the injury occurred on the pier, the longshoremen were not covered under the LHWCA. Had the crane swung the other way and knocked them into the water or onto the ship, they would have been cov-

**5.** Much of this history of the Act is taken from *Northeast Marine Terminal Co. v. Caputo*, 432

U.S. 249, 257-65, 97 S.Ct. 2348, 2353-57, 53 L.Ed.2d 320 (1977).

ered. *Id.* at 225, 90 S.Ct. at 355 (Douglas, J., dissenting).

By 1972, Congress had become dissatisfied with the LHWCA and amended it to broaden the geographic coverage and limit the class of persons covered. *Caputo,* 432 U.S. at 264–65, 97 S.Ct. at 2357. "Navigable waters of the United States," *i.e.,* the *Jensen* line test for situs, was extended to cover "any adjoining pier, wharf, dry dock, ..." etc. 33 U.S.C. § 903(a). The class of persons covered—the test for status—was limited from virtually any employee of a maritime employer to only those employees "engaged in maritime employment." 33 U.S.C. § 902(3). Thus, the 1972 amendments "changed what had been essentially only a 'situs' test ... to one looking to both the 'situs' ... and the 'status.'" *Caputo,* 432 U.S. at 264–65, 97 S.Ct. at 2357. These amendments were intended to provide a uniform compensation system for longshoremen and harborworkers. *Id.* at 269–73, 97 S.Ct. at 2360–62. As *Caputo* recognizes, Congress did not want a system in which coverage "depend[ed] on the 'fortuitous circumstance of whether the injury [to the longshoreman] occurred on land or over water.'" *Id.* at 272, 97 S.Ct. at 2361 (quoting H.R.Rep. 1441, p. 10, *reprinted in* 1972 U.S.Cong. & Admin.News 4698).

This history supports the Director's position. Ever since 1927, the LHWCA has sought to provide comprehensive coverage for maritime employees. Since 1972, the LHWCA has emphasized status over situs to avoid the anomaly of a worker walking in and out of coverage. It would be counter to the history of the statute now to restrict the situs requirement to only those piers with a "maritime use": a maritime employee injured on a pier which is not used for a maritime purpose would continually "walk in and out" of coverage, as did all longshoremen before 1972. Under the Board's functional test, the disfavored "*Jensen* line" would be replaced by a "maritime use" line which would provide coverage under the LHWCA depending upon the use of the pier on which the maritime worker is injured. The Director's interpretation avoids this anomaly by covering all structures built on pilings extending from land

to navigable water. This test is consistent with the evolution of a narrow status test and a broad situs test.

The context of § 903(a) within the LHWCA also favors the Director's construction. The status provision, codified in § 902(3), defines "employee" as "any person engaged in maritime employment." Section 902(3) then specifically describes which workers are included and which excluded. There is no correspondingly detailed definition of "pier," which suggests that Congress intended to limit the class of covered workers but leave the geographic areas such as a pier or wharf unlimited so long as they adjoin navigable waters of the United States.

The board relied on one dictionary's definition of a "pier" as "a platform extending from a shore over water supported by piles or pillars, used to secure, shelter, and provide access to vessels," *Webster's II New Riverside University Dictionary,* to bolster its conclusion that to be a "pier" a structure must have a relationship to vessels and maritime activity. We are not persuaded by the reference. As Hurston points out, other dictionaries define a "pier" as a similar structure used for different purposes, for example, as a place to promenade. *See, e.g., Webster's Seventh New Collegiate Dictionary* (1971); *Webster's New Universal Unabridged Dictionary* (2d Ed.1983). More significantly, however, Congress has already defined the maritime connection it requires for coverage under § 903 by making compensation payable only if the injury occurs upon a pier adjoining the navigable waters of the United States. That nexus adequately supports the Director's interpretation. It is not for the Board, or the courts, to add to that nexus a further requirement that the pier adjoining the navigable waters of the United States be used for boat hook-ups, navigational aids or some other maritime activity.

### C

Hurston and the Director argue that there is ample legal authority to support

the proposition that the phrase "any adjoining pier" means what it says. We agree.

Courts have generally interpreted the LHWCA broadly to provide coverage. "The language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage." *Caputo,* 432 U.S. at 268, 97 S.Ct. at 2359. "The Act must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Id.* (quotation omitted). Based on these rules of construction alone, the Director's more expansive, structural definition of pier over the Board's more narrow, functional one, is justified.

*Caputo's* rationale affords support as well. In *Caputo,* the Supreme Court held that workers who were injured on a pier used only for storing containers were covered under the LHWCA. Although not dispositive on the situs issue, the Court's focus on status is instructive,[6] as is the short shrift it gave to the petitioner's "halfhearted" argument that the pier was not a covered situs because it was not customarily used for loading or unloading a vessel. In so doing, the Court wrote:

> ... [W]e agree with the court below that it is not at all clear that the phrase "customarily used" was intended to modify more than the immediately preceding phrase "other areas." We note that the sponsor of the bill in the House, Representative Daniels, described this section as "expand[ing] the coverage which was limited to the ship in the present law, to the piers, wharves, and terminals." *There was little concern with respect to how these facilities were used.*

*Id.* at 280, 97 S.Ct. at 2365 (emphasis added) (citations and internal quotations omitted). While the Court went on to note that the pier satisfied the situs test even assuming that the phrase should be read to modify the preceding terms, *id.* at 281, 97 S.Ct. at 2366, it concluded that "when Congress sought to expand the situs to avoid anoma-

lies inherent in a system that drew lines at the water's edge, it intended to include an area such as the one at issue here." *Id.* Thus, the Director's construction is consistent with *Caputo's* emphasis on expansive situs coverage, as well as its holding that an adjoining pier used only for storage is a covered site regardless of the fact that it was not used to load or unload vessels.

Our decision in *Williams v. Director, Office of Workers' Compensation Programs,* 825 F.2d 246, 247 (9th Cir.1987) also supports the Director's interpretation. Although we held that Alpine Lake was not a situs within the meaning of § 903(a), we reiterated that the 1972 amendments were intended to "provide[ ] continuous coverage to a worker who would otherwise be covered for only a part of his activity" and that, by including adjoining areas, Congress alleviated the anomaly of a longshoreman's walking in and out of coverage depending on which side of the gang plank an injury occurred. *Id.* We then stated:

> This anomaly is not present when work is done on a non-navigable lake with no functional relationship to maritime activity. A diver working on a non-navigable lake does not walk (or swim) continuously in and out of coverage. Rather, he is working continually out of coverage because he is at a location that does not meet the geographic situs requirement of § 903(a).

*Id.* It is undisputed here that Elwood Pier No. 1 extends to navigable waters, and so has a functional relationship to maritime activity as far as the statute is concerned.

McGray argues that we should follow *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985), where the injury occurred on an off-shore oil platform which McGray contends is functionally similar to the place where Hurston was injured, and *Trotti & Thompson v. Crawford,* 631 F.2d 1214 (5th Cir.1980) and *Jacksonville Shipyards, Inc. v. Per-*

---

**6.** As it stated:

The Act focuses primarily on occupations—longshoreman, harbor worker, ship repairman, shipbuilder, shipbreaker. Both the test and the history demonstrate a desire to pro-

vide continuous coverage throughout their employment to these amphibious workers who, without the 1972 Amendments, would be covered only for part of their activity.

432 U.S. at 273, 97 S.Ct. at 2362.

*due,* 539 F.2d 533 (5th Cir.1976), *reaffirmed,* 575 F.2d 79 (5th Cir.1978), *cert. denied,* 440 U.S. 967, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979), in which the Fifth Circuit applied a functional test. *Herb's Welding* held that a person working on an off-shore oil-drilling platform "was not engaged in maritime employment" and therefore was not a covered employee. *Herb's Welding,* 470 U.S. at 416, 105 S.Ct. at 1423. This was a "status" case, and is inapposite to the "situs" inquiry we face in this case. *See id.* at 425–26, 105 S.Ct. at 1428 (distinguishing dissenting argument which focused on "situs" requirement).

In *Jacksonville Shipyards, Inc.,* the Fifth Circuit read § 903(a) as permitting courts to "look past an area's formal nomenclature and examine the facts to see if the situs is one 'customarily used by an employer in loading, unloading, repairing or building a vessel.'" 539 F.2d at 541. *Jacksonville Shipyards,* however, pre-dated *Caputo,* and involved an abandoned "terminal," not "a situs such as a pier, being built over a clearly covered situs such as the navigable waters." *See Trotti,* 631 F.2d at 1218. *Trotti* is actually closer, as it involved an uncompleted pier, under active construction. The court held that the pier, albeit uncompleted, was a covered situs, as "Congress now expressly prescribes that situs is satisfied for injuries occurring upon any pier adjoining navigable waters." *Id.* at 1219. In light of *Caputo, Trotti,* and our own reading of § 902(3), we are not persuaded by *Jacksonville*'s approach, which depends on construing the phrase "any adjoining pier" to be modified by "customarily used ... in loading, unloading, repairing, dismantling, or building a vessel," 539 F.2d at 541.

Finally, McGray argues that we should be concerned about expanding the LHWCA to confer status based solely on the location, name, or appearance of a structure because what were once piers, wharfs, and so forth, customarily used for loading or repairing vessels, are now offices, homes, restaurants, retail outlets, and parking lots. We are not greatly concerned, however, because people working on such places are covered only if they meet the status requirement; waiters, bellhops, parking lot attendants, and other similar workers do not qualify as "maritime employees" under § 902(3).

Because we consider only situs in this appeal, what then Judge Kennedy said for our court in *Brady–Hamilton Stevedore Co. v. Herron,* 568 F.2d 137 (9th Cir.1978), bears repeating:

> Situs and status must coincide before coverage will attach. Each test acts as a control upon the other so as to diminish the potential for undue expansion of coverage. Admittedly, neither test is precise, and cases will often arise which present questions of coverage that are difficult to resolve. But by operating coordinately, the status and situs tests fix coverage within somewhat more certain bounds than would be the case under either test alone.

*Id.* at 140. All that we now hold is that it is inappropriate to engraft a usage requirement onto "any adjoining pier." Such a pier is by definition in navigable waters and within maritime jurisdiction. Accordingly, we leave for the status inquiry whether the worker is engaged in maritime employment.

## IV

We conclude that a structure built on pilings extending from land to navigable water is an "adjoining pier" within the meaning of 33 U.S.C. § 903(a). This is an essentially factual test which depends upon the structure's appearance and location. Elwood Pier No. 1 meets this factual criteria, and consequently it is a "pier" under the LHWCA. Since this court may only review board decisions, *Port of Portland v. Director, Office of Workers' Compensation Programs,* 932 F.2d 836, 838 (9th Cir. 1991), and the Board failed to decide the status issue, we do not comment on whether the ALJ correctly found that Hurston met the status requirement.

**REVERSED AND REMANDED.**

ALARCON, Circuit Judge, dissenting.

**PREFATORY STATEMENT**

We must decide whether Congress intended to limit recovery under the LHWCA

to employees injured on piers customarily used by an employer for loading, unloading, repairing, dismantling, or building a vessel. The majority appears to have concluded that the word "piers," as used in section 903(a), not only includes a pier used solely for oil production, but also covers piers that support "offices, homes, restaurants, retail outlets, and parking lots." Majority Opinion at 1553.

I respectfully dissent because the majority's interpretation of the word "pier" is inconsistent with the intent of Congress as clearly expressed in section 903(a). The majority's expansive reading of the word "pier" leads to the absurd result that injuries in constructing or repairing a pier that supports an oil production facility or a restaurant are covered pursuant to the LHWCA. We are required by traditional canons of statutory construction to avoid a literal interpretation of a statute that leads to an absurd result or that is contrary to Congress' constitutional power. *See Haggar Co. v. Helvering*, 308 U.S. 389, 394, 60 S.Ct. 337, 339, 84 L.Ed. 340 (1940) ("A literal reading of [statutes] which would lead to absurd results is to be avoided when they can be given a reasonable application consistent with their words and with the legislative purpose.").

If we conclude, as we must, that the word "pier," as used in maritime law, has a different meaning than its more expansive dictionary denotation, the legislative history of the statute unmistakably demonstrates that both houses of Congress intended to limit the word "pier" to a situs used in loading, unloading, repairing, or building a vessel.

Instead of reversing the decision of the Benefits Review Board, I would adopt the Fifth Circuit's well reasoned analysis of this issue in *Jacksonville Shipyards, Inc. v. Perdue*, 539 F.2d 533 (5th Cir.1976), *overruled on other grounds, Texports Stevedore Co. v. Winchester*, 632 F.2d 504, 516 (5th Cir.1980), and avoid a needless intercircuit conflict in this nation's maritime law. *Jacksonville Shipyards* was decided 16 years ago. Congress has had ample opportunity to amend the statute to nullify the Fifth Circuit's construction of section 903(a) if it believed that its intent had been misunderstood.

## I.

## PERTINENT FACTS

The facts are not in dispute. The majority's terse description of the accident site needs amplification in order to demonstrate that Elwood Pier No. 1 is *not* used for loading oil on a tanker. The majority describes the injury site as follows:

> Elwood Pier No. 1 is a structure built on pilings extending from land to sea in the Santa Barbara channel. Oil is pumped from a nearby well and piped into Elwood Pier No. 1 where it is separated into water, gas, and crude oil. *The crude oil is stored until it is pumped into a pipeline to be picked up by a tanker.*

Majority Opinion at 1548. (emphasis added).

In fact, the record shows that the crude oil is not stored on Elwood Pier No. 1 "until it is pumped into a pipeline to be picked up by a tanker." The Administrative Law Judge's (ALJ) uncontested findings reflect the following:

> [Elwood Pier No. 1] was a rectangular structure which was entirely on the beach at low tide, and which extended partly into the ocean water at high tide. *Access was from a road near the beach by a ramp which crossed the beach.* There was no producing oil well on that pier. Elwood Pier No. 2, a separate structure several hundred feet away did produce well fluids. These well fluids were piped to the accident pier. The accident pier [Elwood Pier No. 1] contained automated equipment which separated the well fluids produced at Pier No. 2 into gas, water, and crude oil. The gas was vented to the air. The water flowed naturally back into hydrocarbonized water. *The crude oil was stored in the storage tank on the accident pier until it was pumped in a pipeline, approximately three miles to the Elwood Marine Terminal on a weekly basis.*

(citations to the record in the administrative proceedings omitted) (emphasis added).

The record supports the ALJ's finding concerning the oil production activities performed on Elwood Pier No. 1. Its sole function is to separate the water and gas contained in petroleum drilled from the earth's upper strata. The crude oil produced by Elwood Pier No. 1's automated equipment is *not* loaded onto tankers at that site. The photographs of Elwood Pier No. 1 show that it does not have any ramps or other means of loading crude oil on a tanker. The uncontradicted evidence shows that the loading of the crude oil on tankers occurred three miles away at a totally separate marine terminal. The injuries suffered by Mr. Hurston in this matter did *not* occur at the marine terminal used to load tankers with crude oil. Mr. Hurston was injured while Elwood Pier No. 1 was being repaired.

## II.

### DEFERENCE TO THE DIRECTOR'S INTERPRETATION IS NOT COMPELLED IN THIS MATTER

The Director of the Office of Workers' Compensation Programs contends that the words "adjoining pier," as used in section 903(a), refer to any structure built on pilings extending from land to navigable water, regardless of the structure's use. The majority begins its discussion of the issue presented in this appeal by reminding us that we must accord considerable weight to the Director's construction of section 903(a) because he is charged with administering the statute. Quoting *Force v. Director, Office of Workers' Compensation Programs,* 938 F.2d 981, 984 (9th Cir.1991), the majority states that "since 'the statute is easily susceptible to the Director's interpretation, we need go no further.'" Majority Opinion at 1549. Nevertheless, the majority found it necessary to "go further" for an additional twelve pages in the original typescript version of the opinion to justify its construction of the statute.

We are not required to defer to an agency interpretation of a statute where Congress' intent is clear, or the administrator's construction is unreasonable. "If the intent of Congress is clear, *that is the end of the matter;* for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. National Resources Defense Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984) (emphasis added). The Court explained a reviewing court's duty as follows:

> The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent. If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect.

*Id.* at 843 n. 9, 104 S.Ct. at 2781 n. 9 (citations omitted). This has been the law since *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). In *Marbury,* the Court proclaimed: "It is, emphatically, the province and duty of the judicial department, to say what the law is." *Id.* at 177.

More recently, in *Presley v. Etowah County Comm'n,* —— U.S. ——, 112 S.Ct. 820, 117 L.Ed.2d 51 (1992), the Court emphasized that "[d]eference does not mean acquiescence." *Id.* at ——, 112 S.Ct. at 831. In *Presley,* the Court refused to defer to the Attorney General's construction of a statute because Congress had clearly expressed its intent. *Id.* at ——, 112 S.Ct. at 832. As I will now demonstrate, applying the traditional tools of statutory construction, the Director's interpretation of section 903(a) is contrary to the intent of Congress. Therefore, I cannot defer to his reading of the statute.

## III.

### CONGRESSIONAL AUTHORITY OVER EMPLOYEE COMPENSATION IS LIMITED TO MARITIME INJURIES

Before focusing on section 903(a), a brief history of LHWCA will serve to demon-

strate the intent of Congress in extending coverage to maritime workers for injuries that occur on piers. *See Commissioner of Internal Revenue v. Engle*, 464 U.S. 206, 217, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984) (the circumstances surrounding the enactment of a statute are relevant to the interpretation of a statute).

Article III, section 2 of the United States Constitution provides: The Judicial Power shall extend ... to all cases of admiralty and maritime jurisdiction. The Supreme Court has construed Article III, section 2 as authorizing Congress to enact legislation regarding matters within admiralty and maritime jurisdiction. *In re Garnett*, 141 U.S. 1, 12–14, 11 S.Ct. 840, 842–43, 35 L.Ed. 631 (1891). Congress passed the LHWCA pursuant to its admiralty and maritime jurisdiction. *Crowell v. Benson*, 285 U.S. 22, 40, 52 S.Ct. 285, 288, 76 L.Ed. 598 (1932).

The Court has made clear that the states do not have the authority to apply workers' compensation laws to maritime workers. *Southern Pac. Co. v. Jensen*, 244 U.S. 205, 217, 37 S.Ct. 524, 529, 61 L.Ed. 1086 (1917). In *Jensen*, the Court held New York's workers' compensation law was inapplicable to an injury to a longshoreman that occurred on a gangway between a ship and a pier. *Id.* The Court ruled that the worker's employment was within Congress's admiralty and maritime jurisdiction. *Id.*

After the *Jensen* decision, Congress attempted to provide compensation for workers injured in the course of maritime employment by explicitly authorizing states to apply their workers' compensation laws to maritime workers. Congress passed legislation purporting to preserve "to claimants the rights and remedies under the workmen's compensation laws of any state." Grant Gilmore & Charles L. Black, The Law of Admiralty 407 (2d ed. 1975). In *Knickerbocker Ice Co. v. Stewart*, 253 U.S. 149, 40 S.Ct. 438, 64 L.Ed. 834 (1920), the Supreme Court held that this legislation was an invalid attempt to delegate federal power to the states. *Id.* at 164, 40 S.Ct. at 441. The Court reasoned:

The Constitution itself adopted and established, as part of the laws of the United States, approved rules of the general maritime law and *empowered Congress to legislate in respect of them and other matters within the admiralty and maritime jurisdiction.* Moreover, it took from the States all power, by legislation or judicial decision, to contravene the essential purposes of, or to work material injury to, characteristic features of such law or to interfere with its proper harmony and uniformity in its international and interstate relations. *To preserve adequate harmony and appropriate uniform rules relating to maritime matters and bring them within control of the Federal Government was the fundamental purpose; and to such definite end Congress was empowered to legislate within that sphere.*

*Id.* at 160, 40 S.Ct. at 440 (emphasis added).

Congress again attempted to make state workers' compensation laws apply to maritime workers in 1922. The Supreme Court struck down this congressional attempt to delegate its maritime power in *Washington v. W.C. Dawson & Co.*, 264 U.S. 219, 44 S.Ct. 302, 68 L.Ed. 646 (1924). In that matter, the Court reiterated the principle that Congress cannot delegate to the states the power to apply state workers' compensation laws to maritime workers. *Id.* at 228, 44 S.Ct. at 305. The Court concluded that

[t]he confusion and difficulty, if vessels were compelled to comply with the local statutes at every port, are not difficult to see. Of course, some within the States may prefer local rules; but the Union was formed with the very definite design of freeing maritime commerce from intolerable restrictions incident to such local control. The subject is national. Local interests must yield to the common welfare. The Constitution is supreme.

*Id.*

In response to the Supreme Court's repeated holdings that Congress was responsible for workers within its admiralty jurisdiction, Congress enacted a maritime workers' compensation system. The Longshore

and Harbor Workers' Compensation Act (LHWCA) was designed to fill the void created by the inability of the states to provide workers' compensation for maritime workers. *Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 258, 97 S.Ct. 2348, 2354, 53 L.Ed.2d 320 (1977). The 1927 Act provided coverage only for injuries occurring "upon the navigable waters of the United States" and allowed compensation awards only "if recovery ... through workmen's compensation proceedings [could] not validly be provided by state law." *Id.*

In *Nacirema Operating Co., Inc. v. Johnson*, 396 U.S. 212, 90 S.Ct. 347, 24 L.Ed.2d 371 (1969), the Supreme Court held that injuries to longshoremen that occurred on a pier were not compensable because Congress intended to provide compensation only for workers injured in the areas in which state workers' compensation schemes could not reach. *Id.* at 223–24, 90 S.Ct. at 354. The Court concluded that Congress did not intend to cover workers whose injuries occurred on the landward side of the *Jensen* line. *Id.* at 219, 90 S.Ct. at 352. The Court reasoned that although stopping coverage at the *Jensen* line may be arbitrary and unfair, it was up to Congress to expand coverage, not the courts. *Id.* at 223–24, 90 S.Ct. at 354.

In 1972, Congress responded to the Supreme Court's invitation to amend the LHWCA. The legislative history of the 1972 amendment shows that Congress intended to limit the extension of its coverage to employees who are injured in the course of their maritime employment while on structures that are on land. The House Report provides in pertinent part:

[C]overage of the present Act stops at the water's edge; injuries occurring on land are covered by State Workmen's Compensation laws. The result is a disparity in benefits payable for death or disability for the same type of injury depending on which side of the water's edge and in which State the accident occurs....

. . . .

... It is also to be noted that with the advent of modern cargo-handling techniques, such as containerization and the use of LASH-type vessels, more of the longshoreman's work is performed on land than heretofore.

The Committee believes that the compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstance of whether the injury occurred on land or over water. ...

The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity.

H.R.Rep. No. 1441, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 4698, 4707–08 (emphasis added).

To further its intent to protect longshoremen, ship repairmen, and shipbuilders, whether they are injured on a vessel or working on an adjoining pier as in *Nacirema*, Congress enacted Section 3(a). Section 3(a) reads as follows:

[c]ompensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel.

33 U.S.C. § 903(a).

### A. Plain Meaning of the Word "Pier" As Used in Maritime Commerce

As used in maritime commerce, the word "pier" refers to "a platform extending from a shore over water supported by piles or pillars, used to secure, shelter, and provide access to vessels." Webster's II New Riverside University Dictionary (1984). The majority correctly notes that "pier" can also be used to refer to "a place to promenade." Majority Opinion at 1551.[1]

1. The dictionary cited by the majority defines a

pier as "a structure extending into navigable

To ascribe to Congress an intent to compensate employees injured on a promenade pier with no connection to maritime commerce totally ignores the fact that Congress enacted the LHWCA under its admiralty jurisdiction to protect employers injured while engaged in maritime activities. The majority's conclusion that Congress intended to include injuries occurring on promenade piers within the coverage of the LHWCA ignores the long established principle that the states have exclusive jurisdiction to enact legislation to compensate employees injured on a non-maritime structure constructed on land. The Supreme Court has instructed that courts should avoid a literal interpretation of language used by Congress if such construction would require an absurd result and would be an impermissible exercise of legislature power. *Haggar Co.,* 308 U.S. at 394, 60 S.Ct. at 339. I would interpret the word "pier" as used in section 903(a) to comport with its maritime usage, and thereby avoid a construction that would ascribe to Congress an intent to cover areas over which it has no jurisdiction.

## B. *Each of the Specified Structures are Connected to Maritime Commerce*

In enacting section 903(a), Congress extended coverage beyond the sea to certain specified structures, each of which has a connection to maritime commerce. The structures listed in section 3(a) are pier, wharf, dry dock, terminal, building way, and marine railway. With the exception of the word "pier," each of the other structures is connected to maritime commerce or navigation.

A wharf is a "structure on the margin or shore of navigable waters, alongside of which vessels can be brought for the sake of being conveniently loaded or unloaded, or a space of ground, artificially prepared, for the reception of merchandise from a ship or vessel, so as to promote the discharge of such vessel." Black's Law Dictionary 1595 (6th ed. 1990). A dry dock is a

water *for use as a landing place* or promenade or to protect or form a harbor." Webster's

structure whose purpose is to pull or raise a vessel from the water to examine or repair it. *O'Leary v. Puget Sound Bridge & Dry Dock Co.,* 349 F.2d 571, 573 (9th Cir.1965). A terminal is used to dock ships and to store cargo awaiting loading aboard a ship, or to store off-loaded cargo awaiting inland shipment. *Cuzzolino v. Maher Terminals, Inc.,* 6 BRBS 658, 659 (1977). A building way is a structure used solely for the construction and launching of a new vessel. *O'Leary,* 349 F.2d at 573. A marine railway is a permanently fixed system of tracks or rails which extends from a point on the shore above the water line to a point offshore well below the waterline. A cradle capable of carrying a ship sits upon the railway and moves along the tracks. *Id.* Chains or cables attached to the cradle enable it to carry a docked ship into or out of the water. *Id.*

"The maxim *noscitur a sociis,* that a word is known by the company it keeps, while not an inescapable rule, is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress." *Jarecki v. G.D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 1582, 6 L.Ed.2d 859 (1961). This traditional rule of statutory construction should require this court to limit the word "pier" to its maritime connotation. *See Schreiber v. Burlington N., Inc.,* 472 U.S. 1, 8, 105 S.Ct. 2458, 2462, 86 L.Ed.2d 1 (1985) ("it is a 'familiar principle of statutory construction that words grouped in a list should be given related meaning.'" (quoting *Securities Indus. Ass'n v. Bd. of Governors, FRS,* 468 U.S. 207, 218, 104 S.Ct. 3003, 3009, 82 L.Ed.2d 158 (1984)).

## C. *Section 903(a) Expressly Limits the Extension of the LHWCA to Adjoining Areas Connected to Maritime Commerce*

As explained above, each of the specified structures is connected with the loading or unloading of vessels, or ship repair and

Seventh New Collegiate Dictionary (1971).

construction. Section 903(a) also extended coverage to injuries occurring on other unspecified structures adjoining navigable waters used by an employer in "loading, unloading, repairing, dismantling, or building a vessel." Under the majority's construction of section 903(a), injuries on nonmaritime structures resembling a pier are covered by the LHWCA. A fair reading of the express limitation in section 903(a) to "*other* adjoining areas customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel" should lead to the conclusion that Congress, mindful of the limits of its maritime jurisdiction, explicitly limited the structures covered by the LHWCA to those used in maritime commerce. (emphasis added).

### D. *The Legislative History Limits Section 903(a) to Structures Connected with Maritime Commerce*

Even if we assume that it is unclear whether Congress intended to limit the scope of section 903(a) to structures having a direct nexus to maritime commerce, the legislative history indicates that Congress intended the word "pier" to limit the reach of section 903(a) to areas connected with maritime activity. *See Blum v. Stenson*, 465 U.S. 886, 896, 104 S.Ct. 1541, 1547, 79 L.Ed.2d 891 (1984) ("[w]here ... resolution of a question of federal law turns on a statute and the intention of Congress, we look first to the statutory language and then to the legislative history if the statutory language is unclear.").

The legislative history of section 903(a) demonstrates that Congress was concerned with protecting *maritime* workers. Congress made plain its intention to extend coverage to maritime employees injured while engaged in maritime activities either on navigable waters or on adjoining structures customarily used in connection with loading, unloading, constructing, or repairing vessels. Congress was not concerned with protecting workers covered by state workers' compensation statutes. The House Report stated

> [t]he Committee believes that the compensation payable to a *longshoreman* or a *ship repairman* or *builder* should not

depend on the fortuitous circumstance of whether the injury occurred on land or over water. Accordingly, the bill would amend the Act to provide coverage of longshoremen, harbor workers, ship repairmen, ship builders, shipbreakers, and other amployees [sic] engaged in maritime employment ... if the injury occurred either upon the navigable waters of the United States *or any adjoining pier,* wharf, dry dock, terminal, building way, marine railway, *or other area* adjoining such navigable waters *customarily used by an employer in loading, unloading, repairing, or building a vessel.*

> The intent of the Committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. *The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity.* Thus, employees whose responsibility is only to pick up stored cargo for further transshipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment.

H.R.Rep. No. 1441, 92nd Cong., 2d Sess., *reprinted in* 1972 U.S.C.C.A.N. 4698, 4708 (emphasis added).

The House Report states with estimable clarity that it is not the intent of Congress "to cover employees who are not engaged in loading, unloading, repairing, or building

a vessel, just because they are injured in an area adjoining navigable waters." *Id.* Mr. Hurston was injured while working on an oil production facility adjoining navigable waters. Elwood Pier No. 1 is not covered by section 903(a) because it is not a structure used in connection with servicing a vessel.

The Senate legislative history contains a similar restriction on the situs or area covered by section 903(a). Senator Williams commented as follows in introducing the Senate version of the amendment to the LHWCA:

> Compensation payable to a longshoreman or a ship repairman or builder should not depend on the fortuitous circumstances of whether the injury occurred on land or over water. . . .

> It is our intent to permit a uniform compensation system to apply to employees who would otherwise be covered by this act for part of their activity. To take a typical example, cargo, whether in break bulk or containerized form, is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who performed this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. *We did not intend to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity.*

118 Cong.Rec. 36271 (1972) (statement of Sen. Williams) (emphasis added).

It is clear from the legislative history that in amending the LHWCA to cover structures constructed on land, Congress intended to limit the adjoining areas to places where maritime employees work on vessels.

## IV.

### RELIANCE ON SUPREME COURT DICTUM

The majority states that "[i]n *Caputo* [432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320

(1977)], the Supreme Court held that workers who were on a pier used only for storing containers were covered under the LHWCA." Majority Opinion at 1552. In fact, the Court held that the area where the injury occurred was a situs covered by the LHWCA because "[t]he entire terminal facility adjoined the water and *one of its two finger-piers clearly was used for loading and unloading vessels.*" *Id.* at 281, 97 S.Ct. at 2366. The majority's reliance on dictum in *Caputo* is misplaced.

Chief Justice Marshall long ago cautioned against reliance on dictum:

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before this court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, *but their possible bearing on all other cases is seldom completely investigated.*

*United States v. Ordonez*, 737 F.2d 793, 803 n. 1 (9th Cir.1984) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399, 5 L.Ed. 257 (1821)) (emphasis added); *see also United States v. U.S. Currency $83,-310.78*, 851 F.2d 1231, 1234 (9th Cir.1988) (stating that because the Supreme Court did not decide whether a motion under Rule 41(e) of the Federal Rules of Criminal Procedure survives the filing of a civil forfeiture proceeding, a suggestion in a previous case by the Supreme Court that a Rule 41(e) motion could be used in a civil forfeiture proceeding was dicta and did not need to be followed).

## V.

### REMEDIAL LEGISLATION MUST BE CONSTRUED CONSISTENT WITH LEGISLATIVE INTENT

The majority states that the LHWCA should be construed liberally because it is

remedial legislation. Majority Opinion at 1552. This principle has its limits. The Supreme Court has instructed that " '[a] canon of construction is not a license to disregard clear expressions of ... congressional intent.' " *Andrus v. Glover Constr. Co.*, 446 U.S. 608, 619, 100 S.Ct. 1905, 1911, 64 L.Ed.2d 548 (1980) (quoting *DeCoteau v. Dist. County Court*, 420 U.S. 425, 447, 95 S.Ct. 1082, 1094, 43 L.Ed.2d 300 (1975)) (alteration in original); *see also Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1086 (7th Cir.1984) ("Although the maxim that remedial statutes should be liberally construed is well recognized, that concept has reasonable bounds beyond which a court cannot go without transgressing the prerogatives of Congress."). Although this court should "take an expansive view of the extended coverage" under the LHWCA, *Caputo*, 432 U.S. at 268, 97 S.Ct. at 2359, it is equally clear that "Congress did not seek to cover all those who breathe salt air." *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 423, 105 S.Ct. 1421, 1427, 84 L.Ed.2d 406 (1985). Courts must interpret statutes to comport with congressional intent even if a statute is remedial in nature. Interpreted in light of Congress' admiralty powers, this remedial legislation was clearly not intended by Congress to reach outside the scope of structures with maritime uses.

## VI.

### THE MAJORITY HAS CREATED A NEEDLESS INTERCIRCUIT CONFLICT

The fallacy in the Director's interpretation of the congressional purpose in amending the LHWCA to cover injuries to maritime workers that occur on structures constructed on land is readily apparent from an examination of the facts of this case. Mr. Hurston was dispatched from his union to work on Elwood Pier No. 1 as a pile driver. His employer was engaged in replacing rusted sheet piling on the seaward wall of an oil production facility. The old sheet piles were dug out with a backhoe at low tide. Mr. Hurston was injured when a 1,000 pound sheet pile fell from a crane

that was stationed on top of the oil production facility platform.

An inspection of the photograph (Exhibit B in the administrative record) of Elwood Pier No. 1, attached as an appendix to this dissent, discloses that it has no ramps, runways, gangways, passageways, pumps, or pipes for loading crude oil in a tanker. The loading of tankers occurs three miles away on a terminal equipped for that purpose. Thus, at the time of the injury, Hurston was miles from a structure covered by section 903(a). Nevertheless, solely because the oil production platform stands on pilings in an area adjoining navigable waters, the Director argues that Hurston should be compensated under a statute enacted under Congress' maritime jurisdiction to cover injuries sustained by a longshoreman, ship repairman, or ship builder while working on a vessel.

Ironically, had Hurston been injured while working on a crude oil production facility on an offshore rig, the majority would have been compelled to hold that he was not covered by the LHWCA because "[h]is work [as a pile driver] had nothing to do with the loading or unloading process." *Herb's Welding*, 470 U.S. at 425, 105 S.Ct. at 1428. The majority's conclusion that an injury by an employee not engaged in loading or unloading a vessel on an on-shore oil production structure is covered by the LHWCA appears to be inconsistent with the holding in *Herb's Welding*.

Instead of attempting to extend the reach of the LHWCA beyond Congress' maritime jurisdiction to a land structure that has no connection with the loading, construction, or maintenance of a vessel, I would avoid an intercircuit conflict and adopt the splendid analysis of this issue in *Jacksonville Shipyards, Inc. v. Perdue*, 539 F.2d 533 (5th Cir.1976). In *Jacksonville Shipyards*, the Fifth Circuit construed the situs requirement of section 903(a) as follows:

Our interpretation of the new situs provision follows the same general lines as our construction of Section 902(3). Just as we choose to ignore the labels which an employer or a union has be-

stowed upon an employee, and instead rely upon the employee's work function at the time of the injury, likewise we will look past an area's formal nomenclature and examine the facts to see if the situs is one "customarily used by an employer in loading, unloading, repairing or building a vessel." The clear statutory scheme is to cover employees who are injured while performing certain types of work in an area which is customarily used for such work. Whether or not an employer or local custom has decided to designate an area as a "terminal", for example, is not dispositive of the situs issue. *We will require that a putative situs actually be used for loading, unloading, or one of the other functions specified in the Act.* As with the "maritime employment" test, we also interpret the Act as requiring that the situs meet the statutory requirements as of the time of the injury. It will not suffice if the area was so used only in the past, or if such uses are merely contemplated for the future.

*Id.* at 541 (emphasis added).

The Fifth Circuit's reasoning applies with equal vigor to the facts of this case. The fact that the oil production facility is called "Elwood Pier No. 1" is not controlling. Congress provided that only those structures adjoining navigable waters that involve one of the functions expressly set forth in section 903(a) come within the situs requirement of the LHWCA. *Jacksonville Shipyards* was decided almost 17 years ago. Congress has not amended section 903(a) to reject the Fifth Circuit's functional approach to the situs requirement. By rejecting the functional test set forth in section 903(a), the majority has disregarded congressional intent and created a new operational hazard for maritime employers whose activities span the Fifth and Ninth Circuits.

## CONCLUSION

To paraphrase attorney Brendon Sullivan, federal appellate judges are not mere potted plants in reviewing an agency administrator's construction of a statute. We should reject the Director's construction of section 903(a) because it conflicts with the maritime definition of a pier and attributes to Congress an intent to violate the limits of its maritime jurisdiction by extending coverage to a situs that is not used for loading, unloading, repairing, dismantling, or building a vessel.

I would affirm the Benefits Review Board's order denying benefits under the LHWCA.