**McGRAY CONSTRUCTION COMPANY;**
Beaver Insurance Company,
Petitioners,

v.

**DIRECTOR, OFFICE OF WORKERS
COMPENSATION PROGRAMS;**
Harry Hurston, Respondents.

No. 96–70041.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 13, 1997.

Decided May 2, 1997.

Roger A. Levy, Laughlin, Falbo, Levy & Moresi, San Francisco, California, for petitioners.

Joshua Gillelan, Office of Workers Compensation, Washington, D.C., and John R. Hillsman, McGuinn, Hillsman & Palefsky, San Francisco, California, for respondents.

Before: HUG, Chief Judge; THOMPSON and KLEINFELD, Circuit Judges.

Opinion by Judge THOMPSON; Dissent by Judge KLEINFELD.

DAVID R. THOMPSON, Circuit Judge:

Harry Hurston was injured while working as a pile driver on a pier built and used exclusively for processing oil. McGray Construction Co. ("McGray"), Hurston's employer at the time, petitions for review of the Benefits Review Board decision and order granting Hurston benefits under the Longshoremen's and Harbor Workers' Compensation Act ("LHWCA"), 44 Stat. 1424, as amended, 33 U.S.C. §§ 901–950 (1976 ed.).

This case requires us to interpret the "status" requirement of 33 U.S.C. § 902(3). This section of the LHWCA restricts coverage to injured employees "engaged in maritime employment."

We conclude that Hurston's work repairing a pier was not itself "maritime employment" under section 902(3) because it did not facilitate the loading, unloading, repair or building of vessels. Nevertheless, we hold Hurston was "engaged in maritime employment" under section 902(3) by virtue of his overall occupation as a marine diver. Thus, Hurston satisfied the status requirement and we affirm the Benefits Review Board's award of benefits under the LHWCA.

## I

### FACTS

In March 1985, Harry Hurston was working as a pile driver on Elwood Pier No. 1 for McGray Construction Company. He was helping to repair and replace sheet piling on the seaward sides of the pier. He was injured when a 1,000 pound sheet pile fell from a crane, landed on him, and left him permanently disabled.

Hurston filed a disability claim under the LHWCA against McGray and its workers compensation insurer, Beaver Insurance Company. McGray voluntarily paid Hurston benefits under the state workers compensation law, but contested liability under the LHWCA.

■ To qualify for benefits under the LHWCA, an injured worker must satisfy two requirements: (1) the "situs" requirement, 33 U.S.C. § 903(a), and (2) the "status" requirement, 33 U.S.C. § 902(3). *See Northeast Marine Terminal Co., Inc. v. Caputo*, 432 U.S. 249, 264–65, 97 S.Ct. 2348, 2357–58, 53 L.Ed.2d 320 (1977). In a prior published opinion, we held that Hurston satisfied the situs requirement because his injury occurred on Elwood Pier No. 1, "an adjoining pier" within the meaning of section 903(a).[1] *See Hurston v. Director, Office of Workers Compensation Programs*, 989 F.2d 1547, 1547–48 (9th Cir.1993). We concluded that an "adjoining pier" is any structure built on pilings extending from land to navigable water, regardless of the structure's function. *Id.* at 1549–50. Because Hurston met the situs requirement, we remanded the case to the Benefits Review Board to determine whether he also met the Act's status requirement. *Id.* at 1553.

On remand, the Board concluded that Hurston satisfied the status requirement in two different ways. First, it held that Hurston's work on Elwood Pier No. 1 itself constituted "maritime employment" and was sufficient to confer status. Second, it held that regardless of whether Hurston's work on Elwood Pier No. 1 was "maritime employment," his overall employment history was sufficient to confer upon him maritime status because he spent the vast majority of his total working life engaged in indisputably maritime work.

---

1. Section 903(a) of the Act, which defines the situs requirement, provides:

 compensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

 33 U.S.C. § 903(a).

In this petition for review, McGray contends Hurston did not satisfy the "status" requirement by virtue of his work on Elwood Pier No. 1, and that any status he may have earned by engaging in maritime work for past employers is not "transferable" to his nonmaritime employment by McGray on the day he was injured.

## II

## STANDARD OF REVIEW

■ We review the Benefits Review Board's decision for "errors of law and adherence to the substantial evidence standard." *Port of Portland v. Director, Office of Workers Compensation Programs,* 932 F.2d 836, 838 (9th Cir.1991). Because the Benefits Review Board is not a policy making body, we give no special deference to its interpretation of the LHWCA. *Id.* However, we "accord 'considerable weight' to the construction of the statute urged by the Director of the Office of Workers' Compensation Programs, as he is charged with administering it." *Force v. Director, Office of Workers' Compensation Programs, Dep't of Labor,* 938 F.2d 981, 983 (9th Cir.1991); *Port of Portland,* 932 F.2d at 838; *McDonald v. Director, Office of Workers' Compensation Programs, U.S. Dep't of Labor,* 897 F.2d 1510, 1512 (9th Cir.1990). But, we will "not defer to an agency position which is contrary to an intent of Congress expressed in unambiguous terms." *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 476, 112 S.Ct. 2589, 2594, 120 L.Ed.2d 379 (1992).

## III

## DISCUSSION

■■ The status requirement of section 902(3) limits coverage to "employees," defined as those engaged in "maritime employment." 33 U.S.C. § 902(3). Section 902(3) provides in pertinent part:

The term "employee" means any person engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations, and any

harbor-worker including a ship repairman, shipbuilder, and shipbreaker....

33 U.S.C. § 902(3).[2] By use of the term "including," Congress indicated that the list of specified occupations is not exclusive. *Herb's Welding, Inc. v. Gray,* 470 U.S. 414, 423 n. 9, 105 S.Ct. 1421, 1427 n. 9, 84 L.Ed.2d 406 (1985).

■ A person is "engaged in maritime employment" under the Act if (1) he is engaged in maritime work at the moment of his injury, or, (2) regardless of whether he is engaged in maritime work at the moment of his injury, he spends at least some of his working time for his employer engaged in maritime work. *See P.C. Pfeiffer Co., Inc. v. Ford,* 444 U.S. 69, 83 n. 18, 100 S.Ct. 328, 337 n. 18, 62 L.Ed.2d 225 (1979); *Northeast Marine,* 432 U.S. at 273–74, 97 S.Ct. at 2361–63; *Texports Stevedore Co. v. Winchester,* 632 F.2d 504, 516 (5th Cir.1980) (en banc).

### A. *Hurston's Work Repairing Elwood Pier No. 1*

We turn first to the question whether Hurston was "engaged in maritime employment" by virtue of his work repairing Elwood Pier No. 1. The question is difficult because Congress failed to define the term "maritime employment" in the text of the Act or its legislative history. *See Northeast Marine,* 432 U.S. at 265, 97 S.Ct. at 2357–58. Nonetheless, Supreme Court precedent and the legislative history to the 1972 amendments to the LHWCA suggest that the work Hurston was doing on the pier when he was injured was not itself "maritime employment" within the meaning of the Act.

The Supreme Court has explained that coverage under the Act is limited to those whose work facilitates the loading, unloading, repair or construction of vessels:

The closest Congress came to defining the key terms [in section 902(3) ] is the "typical example" of shoreward coverage provided in the Committee Reports. The example clearly indicates an intent to cover those workers involved in the essential elements of unloading a vessel-taking cargo

---

**2.** Section 902(3) goes on to list several examples of individuals who are *not* engaged in maritime employment, none of which is relevant here. *See* 33 U.S.C. § 902(3).

out of the hold, moving it away from the ship's side, and carrying it immediately to a storage or holding area. *The example also makes it clear that persons who are on the situs but are not engaged in the overall process of loading and unloading vessels are not covered.* Thus, employees such as truckdrivers, whose responsibility on the waterfront is essentially to pick up or deliver cargo unloaded from or destined for maritime transportation are not covered. Also excluded are employees who perform purely clerical tasks and are not engaged in the handling of cargo.

*Northeast Marine,* 432 U.S. at 266–67, 97 S.Ct. at 2358–59 (emphasis added) (internal footnote omitted).[3]

Of all the Supreme Court cases to address the meaning of "maritime employment," *Herb's Welding,* 470 U.S. 414, 105 S.Ct. 1421, is the most analogous to this case. The Court in *Herb's Welding* explained:

... Congress did not seek to cover all those who breathe salt air. Its purpose was to cover those workers on the situs who are involved in the essential elements of loading and unloading; it is "clear that persons who are on the situs but not engaged in the overall process of loading or unloading vessels are not covered." *Northeast Marine Terminal Co. v. Caputo,* 432 U.S., at 267 [97 S.Ct., at 2359]. While "maritime employment" is not limited to the occupations specifically mentioned in § 2(3), neither can it be read to eliminate any requirement of a connection with the loading or construction of ships. As we have said, the "maritime employment" requirement is "an occupational test that focuses on loading and *unloading." P.C.*

*Pfeiffer Co. v. Ford,* 444 U.S. 69, 80 [100 S.Ct. 328, 336, 62 L.Ed.2d 225] (1979). *The Amendments were not meant "to cover employees who are not engaged in loading, unloading, repairing, or building a vessel, just because they are injured in an area adjoining navigable waters used for such activity."* H.R.Rep. No. 92–1441, p. 11 (1972); S.Rep. No. 92–1125, p. 13 (1972). We have never read "maritime employment" to extend so far beyond those actually involved in moving cargo between ship and land transportation.

*Herb's Welding,* 470 U.S. at 423–24, 105 S.Ct. at 1427–28 (emphasis added) (internal footnote omitted).

In *Herb's Welding,* the claimant Gray was injured while working on an oil drilling platform located in Louisiana waters. *Id.* at 416–417, 105 S.Ct. at 1423–24. He worked on a set of platforms as a welder, building and maintaining pipelines and the platforms themselves. *Id.* at 425, 105 S.Ct. at 1428. The Court held Gray was not engaged in maritime employment because:

[h]is work had nothing to do with the loading or unloading process, nor is there any indication that he was even employed in the maintenance of equipment used in such tasks. Gray's welding work was far removed from traditional LHWCA activities.... He built and maintained pipelines and the platforms themselves. There is nothing inherently maritime about those tasks. They are also performed on land, and their nature is not significantly altered by the marine environment....

*Id.*

▆▆▆ Like Gray's work repairing the oil drilling platforms, Hurston's work was unre-

---

3. The Committee Report referred to provides:
 The intent of the committee is to permit a uniform compensation system to apply to employees who would otherwise be covered by this Act for part of their activity. To take a typical example, cargo ... is typically unloaded from the ship and immediately transported to a storage or holding area on the pier, wharf, or terminal adjoining navigable waters. The employees who perform this work would be covered under the bill for injuries sustained by them over the navigable waters or on the adjoining land area. *The Committee does not intend to cover employees who are not engaged in loading, unloading, repairing, or building a*

*vessel, just because they are injured in an area adjoining navigable waters used for such activity.* Thus, employees whose responsibility is only to pick up stored cargo for further transshipment would not be covered, nor would purely clerical employees whose jobs do not require them to participate in the loading or unloading of cargo. However, checkers, for example, who are directly involved in the loading or unloading functions are covered by the new amendment.
 H.R.Rep. No. 1441, 92nd Cong., 2nd Sess. (1972), *reprinted in* U.S.C.C.A.N.1972, p. 4708. (Emphasis added).

lated to the loading or unloading of ships. Ships do not dock at Elwood Pier No. 1. Elwood Pier No. 1 is a rectangular structure built on pilings extending from land to sea in the Santa Barbara, California channel. It is entirely on the beach at low tide and extends partly into the ocean at high tide. Oil well fluids produced from a nearby structure, Elwood Pier No. 2, are piped to Elwood Pier No. 1, where automated equipment separates the bulk fluid into water, gas, and crude oil. The gas is vented into the air. The water flows naturally back into hydrocarbonized water. The crude oil is stored in a tank located on the pier until it is pumped through a pipeline, on a weekly basis, approximately three miles to the Elwood Marine Terminal. At the Elwood Marine Terminal, the crude oil is mixed with crude oil produced from other oil wells, and every five to ten days is pumped to an offshore barge to be shipped to Los Angeles or Benicia to be refined.

The pier is used exclusively for processing and transporting oil, a nonmaritime activity. As noted in *Herb's Welding,* "there is nothing inherently maritime" about repairing a structure used for processing oil, even where the structure is a pier. *See id.*

Nor did Hurston's exposure to the sea while working on the pier confer maritime status upon him. In *Herb's Welding,* the Court stated that to the extent Gray was on or near the water and faced maritime hazards, "it is relevant to 'situs,' not 'status.' ... [T]o classify Gray's employment as maritime because he was on a covered situs or in a 'maritime environment' would blur together requirements Congress intended to be distinct." *Id.* at 425–26, 105 S.Ct. at 1428 (internal citations omitted).

Hurston would be covered under the Act if he had been a "harbor worker" at the time of his injury. He was not a "harbor worker" within the meaning of the Act, however, because only a worker who builds or repairs a structure *used to facilitate maritime commerce or navigation* is such a harbor worker. We look to whether the structure being worked on had any functional relationship to maritime commerce, navigation or construction. *See Laspragata v. Warren George, Inc.,* 21 BRBS 132, ___ (1988), 1988 WL

232727, *3 (Ben.Rev.Bd.); *Rhodes v. Healy Tibbits Construction Co.,* 9 BRBS 605 (1979). Here, it did not.

In sum, Hurston's work repairing Elwood Pier No. 1 was not itself "maritime employment" under the Act.

### B. *Hurston's Work History*

■ Because Hurston's particular work on the pier was not itself "maritime employment," whether Hurston satisfied the Act's "status" requirement depends on whether he was "engaged in maritime employment" by virtue of his overall employment history. It is settled law that a worker regularly assigned both maritime and nonmaritime tasks by the *same* employer has maritime status under section 902(3) even if the worker's activity at the moment of injury was not maritime in nature. *See Northeast Marine,* 432 U.S. at 273, 97 S.Ct. at 2361–62; *Schwabenland v. Sanger Boats,* 683 F.2d 309, 312 (9th Cir.1982); *Texports Stevedore Co. v. Winchester,* 632 F.2d 504, 516 (5th Cir.1980) (en banc).

We have never considered, however, whether a worker may satisfy the Act's requirement of maritime status by virtue of his overall work history, including his work for past employers, when his injury occurs while working at a particular nonmaritime job.

The ALJ and the Benefits Review Board determined that Hurston's overall employment history, ninety percent of which consisted of marine diving, was sufficient to satisfy the maritime status requirement under the Act even though Hurston was injured while performing nonmaritime work. We agree.

■ When interpreting the meaning of a statute, we begin by examining its language. *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). The language of section 902(3) states that the LHWCA covers "any person engaged in maritime employment" who is injured on a covered situs. It is unclear from this language whether a worker is "engaged in maritime employment" only if he has at least some maritime job responsibilities for his

employer at the time of his injury, or whether he is also "engaged in maritime employment" if he has no maritime job responsibilities for his employer at the time of his injury, but maritime employment is his profession and he regularly and customarily performs maritime work for *other* employers. The Director of the OWCP urges us to adopt the latter, broader interpretation.

■■ The statute's language is ambiguous. As a result, "[w]e accord 'considerable weight' to the construction of the statute urged by the Director ... as he is charged with administering it." *Force v. Director, Office of Workers' Compensation Programs, Dep't of Labor,* 938 F.2d 981, 983 (9th Cir. 1991). If an ambiguous statute "is easily susceptible to the Director's interpretation, we need go no further." *Id.* at 984. Here, the language of the statute is not "easily susceptible to the Director's interpretation." Accordingly, we go further.

■■ The Supreme Court directs us to interpret coverage under the Act expansively. "The language of the 1972 Amendments is broad and suggests that we should take an expansive view of the extended coverage." *Northeast Marine,* 432 U.S. at 268, 97 S.Ct. at 2359. "The Act must be liberally construed in conformance with its purpose, and in a way which avoids harsh and incongruous results." *Id.* at 268, 97 S.Ct. at 2359 (internal quotation marks omitted). The Court has been consistent in this approach.

After Congress extended LHWCA coverage in 1972 to certain land-based workers, the Court held that a worker need not be engaged in maritime employment at the time of his injury to be covered under the Act so long as at least some of his employment was maritime in nature. *See P.C. Pfeiffer,* 444 U.S. at 83 n. 18, 100 S.Ct. at 337 n. 18; *Northeast Marine,* 432 U.S. at 273–74, 97 S.Ct. at 2361–63. The Court reasoned that a different interpretation would "revitalize the shifting and fortuitous coverage that Congress intended to eliminate" because an employee might be covered while performing one task and excluded from coverage while performing another task that same day. *Northeast Marine,* 432 U.S. at 274, 97 S.Ct. at 2362–63.

The Director's broad interpretation seems particularly appropriate here because Hurston, like many marine workers, was hired by McGray out of the hiring hall of the Carpenters, Pile Drivers, Rig Builders, Tenders, and Divers Union. Marine workers hired in this fashion regularly work for different employers in short stints, some maritime some not. There is no reason why workers with essentially maritime occupations who work one-day or short-term jobs should not be entitled to the same consistent coverage as those with long-term jobs. Hurston's regular occupation was deep sea diving. He dove in the North Sea, the Coral Sea, the South China Sea, the North and South Pacific, the Bay of Bengal and Cook Inlet, Alaska. Most of his diving, however, took place in and around the waters of the Santa Barbara Channel off the coast of California. He was injured the fourth day he worked on the pier. Immediately preceding this job, he had been engaged in his regular marine employment as a diver, and he was scheduled to begin another diving job when his work on the pier ended.

We have recently held that to determine whether someone has "seaman status" for the purposes of the Jones Act, we consider all work performed by the claimant during the entire relevant period, not just the work he was doing at the time he was injured. *Papai v. Harbor Tug and Barge Co.,* 67 F.3d 203, 206 (9th Cir.), *cert. granted,* —— U.S. ——, 117 S.Ct. 36, 135 L.Ed.2d 1127 (1996). We explained:

There would appear to be no reason that a group of employers who join together to obtain a common labor pool on which they draw by means of a union hiring hall ... should not be treated as a common employer for the purpose of determining a maritime worker's seaman status. If the type of work a maritime worker customarily performs would entitle him to seaman status if performed for a single employer, the worker should not be deprived of that status simply because the industry operates under a daily assignment system. Under such circumstances, a maritime

worker who regularly performs seaman's work is entitled to seaman status....

In short, all the circumstances surrounding the work performed by [the] plaintiff for [the] defendant ... prior to (and after, if any) the accident, as well as work performed for other employers during the relevant time should be considered in making the determination.

*Papai,* 67 F.3d at 206.

■ This same analysis applies in determining whether an injured worker has maritime status under section 902(3) of the LHWCA. Because the marine diving work Hurston customarily performed is maritime employment under section 902(3),[4] he should not be deprived of that status simply because the industry operates under a daily assignment system.

This is consistent with the Supreme Court's consideration of the injured claimant's overall employment history in *Northeast Marine.* There, the claimant, Ralph Caputo, was a member of a regular longshoring "gang" that worked for one employer. *Northeast Marine,* 432 U.S. at 254, 97 S.Ct. at 2352. When his gang was not needed, Caputo went to the waterfront hiring hall, where he was hired by the day by other stevedoring companies or terminal operators. *Id.* at 254–55, 97 S.Ct. at 2352–53. On the day of his injury, Caputo was hired by Northeast Marine as a terminal laborer. *Id.* A terminal laborer may be assigned to load and unload containers, lighters, barges, and trucks. *Id.* When Caputo arrived at the terminal, he was assigned to help load consignees' trucks with cargo that had already been off loaded from ships at Northeast's terminal. *Id.* Caputo was injured while rolling a dolly loaded with cheese into a consignee's truck. *Id.*

The Court held that, whether or not transporting cheese from the dock to the truck was itself maritime employment, Caputo was clearly covered under the act by virtue of his overall occupation as a longshoreman. The Court explained,

The Act focuses primarily on occupations-longshoreman, harbor worker, ship repairman, shipbuilder, shipbreaker. Both the text and the history demonstrate a desire to provide continuous coverage throughout their employment to these amphibious workers who, without the 1972 Amendments, would be covered only for part of their activity. It seems clear, therefore, that when Congress said it wanted to cover "longshoremen," it had in mind persons whose employment is such that they spend at least some of their time in indisputably longshoring operations and who, without the 1972 Amendments, would be covered for only part of their activity.

That Caputo is such a person is readily apparent. *As a member of a regular stevedoring gang, he participated on either the pier or the ship in the stowage and unloading of cargo.* On the day of his injury he had been hired by petitioner Northeast as a terminal laborer. In that capacity, he could have been assigned to any one of a number of tasks necessary to the transfer of cargo between land and maritime transportation.... Not only did he have no idea when he set out in the morning which of these tasks he might be assigned, but in fact his assignment could have changed during the day. Thus, had Caputo avoided injury and completed loading the consignee's truck on the day of the accident, he then could have been assigned to unload a lighter. Since it is clear that he would have been covered while unloading such a vessel, to exclude him from the Act's coverage in the morning but include him in the afternoon would be to revitalize the shifting and fortuitous coverage that Congress intended to eliminate.

*Id.* at 273–74, 97 S.Ct. at 2362–63 (emphasis added). Thus, in considering Caputo's rele-

---

4. Deep sea divers are "engaged in maritime employment" under the Act because the Supreme Court has held that "when a worker is injured on the actual navigable waters in the course of his employment on those waters, he satisfies the status requirement in § 2(3), and is covered under the LHWCA." *Director, Office of Workers'* *Compensation Programs, U.S. Dep't of Labor v. Perini North River Associates,* 459 U.S. 297, 324, 103 S.Ct. 634, 650–51, 74 L.Ed.2d 465 (1983). This assumes, of course, that he is the employee of a statutory "employer" and is not excluded by any other provision of the Act. *Id.*

vant "employment," the Court considered both his actual work and his potential duties with his employer at the time of his injury, as well as his "regular" duties with his stevedoring gang which were performed for a different employer.

· Applying the *Northeast Marine* analysis, Hurston is entitled to coverage. While his job duties with McGray on the particular occasion of his injury were limited to nonmaritime duties, since 1958 Hurston spent 90% of his working time as a marine diver and 10% as a pile driver. All but one of his pile driving jobs (the job during which he was injured) were performed afloat.

Further, McGray had reason to know Hurston was engaged in the profession of maritime work when McGray hired him. McGray hired Hurston out of the marine divers union hiring hall. Hurston was regularly eligible for assignment through the hiring hall to indisputably maritime employment. Indeed, he had worked for McGray on a prior occasion as a deep sea diver, an indisputably maritime job. *See Perini North River Associates,* 459 U.S. at 324, 103 S.Ct. at 650–51. When the union had no diving job to dispatch him to, Hurston accepted this job with McGray. He should not be denied coverage under the Act because he happened to be injured while temporarily engaged in nonmaritime work. Hurston's overall occupation was clearly maritime in nature.

McGray argues it is unreasonable that a land-based employer such as itself should have to pay longshore benefits to an employee hired to perform exclusively nonmaritime work, simply because the employee has spent most of his working time engaged in an indisputably maritime occupation. We disagree. The goal of the 1972 amendments was to provide consistent coverage for those who spend some portion of their employment in indisputably maritime work and those engaged in maritime occupations. *Northeast Marine,* 432 U.S. at 273–74, 97 S.Ct. at 2361–2363. This goal would be undermined if maritime workers such as Hurston, who customarily spend the vast majority of their working lives in indisputably maritime work, lost coverage under the LHWCA simply because on a given day—the day of an injury—

they happened to be engaged in nonmaritime work. Such "walking in and out of coverage on a daily basis" would be particularly inappropriate here where the employer, McGray, hired Hurston from a hiring hall that regularly dispatched workers to marine employment jobs, and the employer knew Hurston was a marine diver.

## IV

## CONCLUSION

We conclude Hurston satisfied the status requirement of 33 U.S.C. § 902(3) and is therefore eligible for benefits under the LHWCA. Although Hurston's work on Elwood Pier No. 1 at the time he was injured was not itself "maritime employment" because it had no relationship to the loading, unloading, repair or building of vessels, Hurston was "engaged in maritime employment" under the Act by virtue of his overall occupation as a marine diver.

AFFIRMED.

KLEINFELD, Circuit Judge, dissenting:

I respectfully dissent.

While I agree with the majority that Hurston was not engaged in maritime employment at the time of his injury, I do not agree that Hurston's past record of maritime employment can transmute his entitlement to state worker's compensation into a federal entitlement to Longshoremen's and Harbor Workers' Act benefits.

Suppose two construction workers are hired to do exactly the same non-maritime job together, Hurston's job, which we are told is "pile driver to repair and replace sheet piling on an oil processing platform." Assume that, as in the case at bar, a load is accidentally dropped on them as they work side by side, injuring them both to the same extent. If one used to be a diver and hopes to be again, like Hurston, and the other has always been a sheet pile driver, then under the decision announced today, they get different benefits. The worker who used to be a diver gets higher compensation under the Longshoremen's and Harbor Workers' Compensation Act (the Act), the life-long sheet

pile driver gets lower compensation under the state workers compensation law. That is not fair. We err in so construing the statute. Congress did not create an aristocracy of labor, so that long-time maritime workers would be compensated more amply than others, even when hired for non-maritime employment, keeping their superior status while between maritime jobs.

The word "engaged" is used in the statute in a context which plainly shows its relationship to the word "employed":

> The term 'employee' means any person *engaged in* maritime employment, including any longshoreman or other person engaged in longshoring operations, and any harbor-worker including a ship repairman, shipbuilder, and ship-breaker, but such term does not include
>
> (A) individuals *employed* exclusively to perform....
>
> (B) individuals *employed* by....
>
> (C) individuals *employed* by....
>
> (D) individuals who (i) are *employed* by .... (ii) are temporarily doing business on the premises .... and (iii) are not *engaged in* work....
>
> . . .
>
> (H) any person *engaged* ....

33 U.S.C. § 902(3) (emphasis added).

The words "engaged" and "employed" in this statute appear to be used conventionally, to mean what they ordinarily do. The Act says "the term 'employee' means any person *engaged* in maritime employment." 33 U.S.C. § 902 (emphasis added). The word "engaged" means, in the context of employment, "employed, occupied, or busy." *American Heritage Dictionary* 454 (2d Coll. ed.1985). It is a form of the word "engage," which means, in the employment context, "to obtain or contract for the services of; employ." *Id.* Thus the words in the statute cover a person who is employed, occupied or busy in the performance of maritime duties, or one whose services have been obtained for the performance of maritime duties.

In some cases, described below, there is a significant distinction between the work one was engaged *for*, i.e., employed for, and the

work he is engaged *in* at the time of the accident. A person might be engaged *for* maritime work, but engaged *in* non-maritime work at the time of the accident, or vice-versa. That distinction gives rise to the problem solved by *Northeast Marine Terminal Co. v. Caputo*, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). But the problem does not arise in this case. The majority concedes that Hurston was employed to do a non-maritime job, and was engaged in the non-maritime work for which he was hired at the time of the accident.

The statutory usage is no different from the way we ordinarily talk. Suppose a man who has been a lawyer all his life, but enjoys photography, takes a sabbatical by going to work as an assistant to an architectural photographer for six months. He will say of himself "I am a lawyer," but he will also say "I am currently *engaged in* architectural photography, having been employed for that purpose." He will not say "I am currently engaged in the practice of law." Hurston, the diver engaged in construction work, is analogous to this lawyer. For Hurston to be analogous to the covered employee in *Northeast Marine Terminal*, we can change the hypothetical to a lawyer working for an insurance defense law firm, who is going out to look at an accident site, and whose supervising partner tells him to take a picture of it. This picture-taking lawyer would be analogous to *Northeastern*. Though at the moment he snaps the picture, he is not writing briefs or arguing in court, he will still say "I am engaged in the practice of law." "[T]he crucial factor is the nature of the activity to which a worker may be assigned." *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 82, 100 S.Ct. 328, 337, 62 L.Ed.2d 225 (1979).

The Act covers people who are engaged in maritime work. That is what it says. It does not cover people who have been engaged in maritime work during other employments, but not in their current employment. The phrase "engaged in maritime employment" is a limitation on coverage which means that it does not. The subtlety when one's current job involves both maritime and non-maritime work is missing from Hurston's case. Hurston was not "engaged

in" maritime work, nor was he employed to do any maritime work during this employment. Because the word "engaged" is not ambiguous in this case, we have no reason to scour legislative history (which offers no more support for today's construction than the statutory language). Nor can we properly defer to an administrative agency which may be dissatisfied with the limitations Congress has placed on its jurisdiction.

As the majority concedes, no precedent requires the result reached in this decision—the question is one of first impression. I will concede that no precedent plainly requires the result I suggest either. Perhaps no one has before suggested to an appellate court that one who used to be a maritime worker, but was employed for and engaged in non-maritime work when injured, would be covered under the Act just as though he had been engaged in maritime work. It has long been understood that the "maritime employment" test was "an occupational test that focuses on loading and unloading." *P.C. Pfeiffer Co. v. Ford*, 444 U.S. 69, 80, 100 S.Ct. 328, 336, 62 L.Ed.2d 225 (1979). "[P]ersons who are on the situs but are not engaged in the overall process of loading and unloading vessels are not covered." *Northeast Marine Terminal v. Caputo*, 432 U.S. 249, 267, 97 S.Ct. 2348, 2359, 53 L.Ed.2d 320 (1977). That is why a welder on an offshore oil drilling platform was held not to be covered in *Herb's Welding, Inc. v. Gray*, 470 U.S. 414, 105 S.Ct. 1421, 84 L.Ed.2d 406 (1985). "Congress did not seek to cover all those who breathe salt air." *Id.* at 423, 105 S.Ct. at 1427.

The majority misunderstands the Congressional concern, reflected in the 1972 amendments, that one should not walk in and out of coverage. As *Northeast Marine Terminal, Herb's Welding,* and *P.C. Pfeiffer,* make clear, this is a concern about longshoremen, people who load and unload vessels. Longshoremen are not supposed to walk out of their coverage under the Act when they carry their loads off the gangplank or dock, or when they unload containers unsealed on the wharf. In *Northeast Marine Terminal,* both claimants were hired to do maritime jobs. One was engaged to check and mark items as

they were unloaded. The Court said this was traditional longshoreman's work moved shoreward by containerization. The other was hired as a member of a stevedoring gang to transfer cargo, so his tasks would be both on vessels and on land. It was that it was fortuitous and unfair "to exclude him from the Act's coverage in the morning but include him in the afternoon," *id.* at 274, 97 S.Ct. at 2362–63, while he was performing the same contractual engagement for the same employer doing the traditional longshoreman's maritime job of loading and unloading. The 1972 amendments made it clear that if a person was hired to unload a vessel, he did not have coverage under one act when he picked up his load on board, and another when he put it down in a truck on shore.

There was nothing fortuitous or unfair about Hurston being covered by workers compensation rather than the Act. He knew when he took the job that he would be doing construction, not maritime work. He was between diving jobs. The claimants in *Northeastern* were hired to work as longshoremen. Hurston was not hired to do his usual maritime work, diving, and he knew from the moment of his hire that on this job he was not being engaged as a diver. There was no danger of his diving in and out of coverage, because he was not going to do any diving at all.

There are no cases which hold that a person with a maritime career, between maritime jobs, can collect benefits under the Act if engaged at a maritime situs for non-maritime work. *P.C. Pfeiffer Co. v. Ford,* 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979), holds that the status and situs tests are independent, and "workers doing tasks traditionally performed by longshoremen are within the purview of the 1972 Act." *Id.* at 82, 100 S.Ct. at 337. *Schwabenland v. Sanger Boats,* 683 F.2d 309 (9th Cir.1982), involved an employee hired to perform maritime and non-maritime work in his job, hurt when his boat tipped over; we held that his "regular performance of maritime operations" (on this job, not prior jobs as in the case at bar) established coverage. *Papai v. Harbor Tug and Barge Co.,* 67 F.3d 203 (9th Cir.1995), is a Jones Act case involving a man hurt while

painting a tugboat; his entitlement to Longshoremen's and Harbor Workers' Compensation Act benefits was not at issue. *Texports Stevedore Co. v. Winchester,* 632 F.2d 504 (5th Cir.1980) (en banc), is a situs case; no question of whether the worker was engaged in maritime work was before the court.

The majority opinion correctly points out that Hurston was hired out of a maritime union hall. His employer had some notice that Hurston's career probably included past maritime employment. But *P.C. Pfeiffer* expressly rejects the suggestion that "the scope of maritime employment depends upon the vagaries of union jurisdiction." *P.C. Pfeiffer,* 444 U.S. at 82, 100 S.Ct. at 337. Under *P.C. Pfeiffer,* the fact that Hurston was hired out of a maritime hall cannot make his employment maritime.

The practical consequences of today's decision are worrisome. Giving Hurston coverage under the Act because he was hired out of the maritime union hall can have the unfortunate practical effect of discouraging employers from hiring out of the hall for non-maritime work. We have also created a trap for the unwary employer who does not explore the work history of someone he hires. For sophisticated employers, who are advised by counsel of today's decision, we have created a reason to discriminate against maritime workers who apply for non-maritime jobs. As a result of today's decision, sophisticated employers hiring for non-maritime work at a maritime situs may ask "Have you ever done maritime work?" and if the answer is "Yes," refuse to hire them so long as employees without maritime work histories are available. Our decision establishing career maritime workers as an aristocracy of labor for purposes of compensation for injuries makes them less desirable hires for non-maritime work.